67 N.J. Super. 223 (1961)
170 A.2d 461
MAPLE HILL FARMS, INC., A NEW JERSEY CORPORATION, AND J. HANNON HUGHES, APPELLANTS,
v.
DIVISION OF THE NEW JERSEY REAL ESTATE COMMISSION IN THE DEPARTMENT OF BANKING AND INSURANCE, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted March 6, 1961.
Decided April 25, 1961.
*225 Before Judges GOLDMANN, FOLEY and LEWIS.
Messrs. Powell & Davis, attorneys for appellants (Mr. James M. Davis, Jr., on the brief).
Mr. David D. Furman, Attorney General of New Jersey, attorney for respondent (Mr. David Landau, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by LEWIS, J.A.D.
Appellants J. Hannon Hughes, a licensed real estate broker, and his licensed corporate instrumentality, Maple Hill Farms, Inc., bring this appeal to review an order and determination of the New Jersey Real Estate Commission (R.R. 4:88-8(a)) revoking the real estate broker's license of J. Hannon Hughes. The Commission found, after notice and hearing, that the appellant J. Hannon Hughes was guilty of making false promises (in violation of N.J.S.A. 45:15-17(a)) and that his conduct demonstrated bad faith and unworthiness (in violation of N.J.S.A. 45:15-17(e)). The penalty imposed was the revocation of his broker's license (which had the effect of also revoking the license of his company because of the statutory requirement that the license of a corporation shall cease if *226 at least one officer does not hold a license as a broker) effective May 1, 1960. This court, with the consent of the Attorney General, issued a stay of the revocation order without prejudice to the right of the Commission to summarily revoke, without further notice or hearing, any conditional renewable licenses granted to the appellants because of the existence of the stay, provided that the judgment or order of the Commission, which is the subject of this appeal, shall be affirmed.
Appellants contend that the evidence was inadequate to support the findings of the Commission, the evidence did not justify a revocation of the brokers' licenses, the charges did not relate to activities connected with the pursuit of their licensed privileges, and that the Commission erred when it recommended that the appellant Hughes effect a reasonable settlement with the complainant.
The judicial power to review the determinations of an administrative agency and, if necessary, to make independent findings is beyond question. R.R. 4:88-13, 1:5-4(b) and 2:5. Where the findings of the Real Estate Commission have been supported by adequate evidence, they have been sustained, Middleton v. Div., etc., Dept. of Banking and Ins., 39 N.J. Super. 214 (App. Div. 1956); absent such evidence, they have been reversed, Zachariae v. New Jersey Real Estate Comm., 53 N.J. Super. 60 (App. Div. 1958); and where the findings have been improper in form they have been modified accordingly, Goodley v. New Jersey Real Estate Comm., 29 N.J. Super. 178 (App. Div. 1954).
The scope of judicial review is well charted. The court will not presume to substitute its judgment for that of a quasi-judicial body where there is proof to support its conclusion. Dutcher v. Department of Civil Service, 7 N.J. Super. 156, 163 (App. Div. 1950); Lakewood Express Serv. v. Board of Public U. Com'rs., 1 N.J. 45, 52 (1948). It is not the function of the courts to weigh the evidence, to determine the credibility of witnesses, to draw inferences and conclusions from the evidence, and to resolve conflicts *227 therein. Hornauer v. Division of Alcoholic Beverage Control, 40 N.J. Super. 501, 504 (App. Div. 1956), and the quotation therein from Chief Justice Vanderbilt's analysis of developments in administrative law written for the 1946 Annual Survey of American Law (N.Y.U. School of Law), 187, 229. Where an administrative agency has acted within its authority, "sympathetic sweep" is given to the rule that its actions will generally not be upset unless there is an affirmative showing that its judgment was arbitrary, capricious or unreasonable. Borough of East Paterson v. Civil Service Dept. of N.J., 47 N.J. Super. 55, 65 (App. Div. 1957). The now generally accepted gauge of administrative factual finality is whether the finding is supported by substantial evidence. In re Larsen, 17 N.J. Super. 564, 576 (App. Div. 1952). Our review of the record should be within the pattern of these decisions.
On August 12, 1959 John H. Wichser, Jr., made a verified complaint to the Real Estate Commission against the plaintiffs. He alleged, in substance, that in June 1958 he purchased a lot from J. Hannon Hughes, a licensed real estate broker, trading as Maple Hill Farms, Inc.; the selling price was $2,500; Hughes verbally agreed to share the estimated expense of $500 for filling, grading and seeding the lot; he instructed Hughes to engage a reliable contractor to do the work and, after much delay, the work was finally completed June 25, 1959; when Hughes was contacted for payment of his share he denied any agreement and refused to pay; Wichser paid the entire bill of $453; and Hughes has refused to reimburse him for $226.50, his equal share. The complaint did not mention the written agreement between the parties dated June 14, 1958, and it did not state the specific date of the alleged oral agreement other than the allegation that it was made in "June 1958."
The testimony of the appellant Hughes was that the property had been offered to Wichser "at $3,000, or $2,500 as is. He had his choice," and that appellants were willing *228 to sell it either way "$3,000 and we would put the dirt in, or $2,500 as is." He further testified "There was a discussion  well, I would say prior to the signing of the agreement of sale, we had discussed it back and forth, as to what it would cost to fill the lot, and then the price was given to him both ways." Hughes denied the oral promise as stated by Wichser. Hughes' version was:
"Q. Did you ever, at anytime, promise Mr. Wichser that you would be in any way financially responsible for any bill or grading of this property?
A. No, other than I would help him when they were working on the lot. I would be glad to help him out, and that I had top soil and fill dirt. I would be glad to give him any amount of that if he wanted to haul it. That is as far as it went."
Under cross-examination, and in answer to a question as to the reason or explanation for the reduced purchase price, Wichser testified:
"I didn't think the ground was worth it. It was in such a condition sloping from street level down about eight feet anyway below the street at the rear, I knew there would be some filling necessary upon building the residence."
Wichser further testified in referring to the settlement on June 25:
"* * * At that time Mr. Hughes made the statement that the cost would be assumed mutually. Then I said, `Well look Hughes, I'm not too familiar with this grading stuff. Will you please take care of it? Will you contract someone reliable and do the job? Now, approximately how much is this going to cost?' He said, `We can get this thing graded, filled and seeded for $500.' I said, `That's fine.' And I said `We'll split the cost; we'll go fifty-fifty.' He said, `It's agreeable with me.' We shook on it. As I say, my wife was there and Mr. Hughes's wife also was there."
There was a wide area of disagreement between the parties arising from a combination of oral statements, misunderstandings and promises aliunde the formal agreement of sale. The testimony leading up to and surrounding the *229 execution of the agreement dated June 14, 1958 is not clear. Obviously, there was a misunderstanding. Wichser testified that on that date he and Hughes discussed the grading problem and Hughes said "don't worry about it, we'll take care of it * * *." Further, when the parties met at the settlement on June 25, and the deed passed, Hughes is alleged to have stated that he would take care of all the grading, filling and seeding. However, he finally said that he would split the cost fifty-fifty. It was on this date that the building contract with one Kuteroff, prepared by Hughes, was also executed.
Amid the conflicting testimony, there appear to be certain indisputable facts which should be noted. Wichser originally contacted Hughes, as a licensed real estate broker, for the purpose of buying a house. He subsequently decided to purchase a vacant lot on Garden Street in Mount Holly and build his own house. This property, owned by Hughes and co-owner, Robert A. Cook, was sloping, low in the rear and needed grading. The asking price of $3,000 was reduced to $2,500. Hughes, at the request of Wichser, arranged for the grading, filling and seeding work to be done and engaged the contractor, Mr. Schwertzler. Two bills were rendered by Schwertzler, one for $346, later adjusted to $248, and a second bill for $205. Wichser paid the entire cost of $453 and Hughes refused to assume any part of it. There was a written agreement of sale, standard form, dated June 14, 1958 signed by the parties, wherein the lot was described by metes and bounds, the consideration stated to be $2,500 and final settlement scheduled to be held on or before June 30, 1958. This agreement contained a provision that "the premises shall be conveyed in the same condition as the same now are, reasonable wear and tear excepted." Wichser, when asked if he ever read the agreement, testified: "Yes, I think I did."
A review of the proceedings and the testimony before the Commission does not reveal adequate or substantial evidence to support a finding that appellants were guilty *230 of making "false promises" as contemplated by N.J.S.A. 45:15-17(a). An unfulfilled promise or agreement is not necessarily a false promise. In a juristic sense, the word "false" frequently implies something more than a mere untruth. Dombroski v. Metropolitan Life Ins. Co., 126 N.J.L. 545, 548 (E. & A. 1941).
In a Texas case a false promise was in issue and the court, in treating that subject, said:
"A false promise to do some act in the future is a promise which the promisor did not intend to perform at the time it was made. In order to be false, a promise must be made with intention not to perform it." Prideaux v. Roark, 291 S.W. 868 (Tex. Com. App. 1927).
Compare Gilpin v. Merchants National Bank, 165 F. 607, 611, 20 L.R.A., N.S., 1023 (3 Cir. 1908), where a false statement was held to connote a guilty scienter; and Wood v. State, 48 Ga. 192, 297, 15 Am. Rep. 664 (Sup. Ct. 1873), holding "false means that which is not true, coupled with a lying intent." See, also, Abraham v. Wilson & Co., 121 N.J.L. 530, 533 (E. & A. 1938).
The words "false promises" are included in our false pretense statute which is intended to make criminal the false statement of an existing state of mind. N.J.S. 2A:111-1; State v. Kaufman, 18 N.J. 75 (1955). In equity it has been held that an assurance with a subsequent change of mind is a mere moral wrong, while an assurance with a present intention never to follow through with it is a fraud. Gilbert v. Gilbert, 61 N.J. Super. 476, 482 (Ch. Div. 1960). In Roberts v. James, 83 N.J.L. 492, 497 (E. & A. 1912), Lord Bowen is quoted as saying "* * * the state of a man's mind is as much a fact as the state of his digestion."
Nowhere in the complaint, the testimony of witnesses, or the recital of facts upon which the Commission's findings were predicated is there any averment or indication that Hughes, at the time of the alleged oral promise, did not *231 intend to perform, or that his promise at that time was false; there was no finding of "false intentions," "fraudulent inducement," "lying intent," "intent to deceive," "scienter," or equivalent conduct upon which to imply a false promise. The testimony adduced at the hearing established with certainty that the alleged verbal promise of Hughes to split "fifty-fifty" the cost of filling, grading and seeding (the gravamen of Wichser's complaint) was made at the time of settlement (June 25, 1958) and not at the time of signing the written agreement (June 14, 1958), when, as Wichser admitted, there was a misunderstanding.
There was, however, ample evidence in the record to support the Commission's findings that the conduct of appellants demonstrated bad faith and unworthiness in violation of N.J.S.A. 45:15-17(e). Hughes dominated the real estate transaction and it was his responsibility as a licensed real estate broker to exercise reasonable prudence and care to avoid misunderstandings such as developed in his dealings with Wichser. The written contract of June 14, 1958 should have fully embodied the terms of the agreement between the parties, particularly so when Hughes, one of the sellers, acted in a dual capacity of co-owner and real estate broker. The New Jersey Real Estate Manual (1928) published by the Commission as a guide to the real estate profession specifically provides:
"The contract for the sale of real estate is the most important document in a real estate sale or exchange, because under it and by it the respective rights and duties of the parties are fixed and it controls all of the proceedings subsequent to it, including the final consummation of the transaction. It is absolutely necessary that all the provisions of the agreement be set forth in the contract for, after it is once signed, nothing can be added to or taken from it except by consent of all the parties to it. A thorough working knowledge of the contract, its purpose and effect are essential to the owner, the purchaser and the broker." (at p. 24.)
Even if the alleged oral agreement were legally unenforceable and a mere moral assurance made subsequent to *232 the written agreement, its repudiation by Hughes, under the circumstances, would evidence conduct of bad faith and unworthiness  particularly so in the light of the admission by Hughes to William M. Morgan, an investigator for the Commission, that he, Hughes, "agreed to split the first bill with Mr. Wichser." Unworthiness, as used in the applicable statutes, "signifies a lack of those ethical qualities that befit the vocation." Goodley v. New Jersey Real Estate Co., supra (29 N.J. Super., at p. 181). The administrative agency resolved the issue of credibility against Hughes. The evidence substantially and adequately supports its conclusion of bad faith and unworthiness and this court should not interfere with such findings. There is a presumption of reasonableness that attaches to the Commission's action. Elizabeth Federal S. & L. Ass'n v. Howell, 24 N.J. 488, 508 (1957).
As a matter of statutory right, the Commission was justified in revoking appellants' licenses once it found and determined that appellants violated any of the enumerated offenses under N.J.S.A. 45:15-17; specifically, the Commission had the right, in its discretion, either to suspend or to revoke their licenses. Ibid.
Appellants contend that the charges against them do not relate to activities connected with the pursuit of their licensed privileges. This contention, as a defense, is without merit. It has heretofore been decided in Division of the N.J. Real Estate Comm. v. Ponsi, 39 N.J. Super. 526, 533 (App. Div. 1956), that the acts of a licensed broker "are not necessarily restricted to those committed in the pursuit of the privileges accorded by the license." Wichser contacted Hughes, as a licensed real estate broker, who negotiated the sale, prepared the agreement, and attended the settlement. The alleged verbal agreement was an integral part of the settlement. The fact that he had an interest in the title to the property which was sold to Wichser is all the more reason to expect Hughes to pursue and maintain the high standards of his profession.
*233 The letter of the Real Estate Commission recommending that appellant Hughes effect a reasonable settlement with Wichser has been characterized by appellant Hughes as "a pistol at his head to compel him to do that which he contended he was legally under no duty to do." It is not within the province of the Commission to resolve legal rights or liabilities of complainants and brokers inter sese. It is not a tribunal for the adjudication of civil rights. Tomei v. Annetta, 11 N.J. Super. 456, 461 (App. Div. 1951). Assuredly, such an administrative body should not assume the functions of a collection agency. Our Real Estate License Act (N.J.S.A. 45:15-17) is a regulatory statute within the police power of the State. Kenney v. Paterson Milk & Cream Co., 110 N.J.L. 141, 144 (E. & A. 1932); Corson v. Keane, 4 N.J. 221, 227 (1950); Tanenbaum v. Sylvan Builders, Inc., 29 N.J. 63, 71 (1959).
The Commission's letter was not an order, it was only a recommendation which the Commission might well make in furtherance of its design and statutory power to safeguard the interest of the public. Any such recommendation, however, should be limited to the statutory objectives of the Commission, which, as stated in the Ponsi case, supra, 39 N.J. Super., at page 532, are "to scrutinize in general and with care the character, competency, and integrity of license applicants and license holders to the end that in the interest of the public welfare, incompetent, unworthy and unscrupulous persons would be excluded from the real estate brokerage business." Appellants in the present case did not accede to the settlement recommendation, neither did they answer the Commission's letter. The revocation of their licenses, however, was not predicated upon such inaction but rather upon the violation of subdivisions (a) and (e) of N.J.S.A. 45:15-17, and the record bespeaks substantial evidence to support the Commission's findings of guilt under N.J.S.A. 45:15-17(e).
The imposition of a single penalty for more than one infraction may normally be unassailable. Note the discussion *234 on this subject in the Middleton case, supra (39 N.J. Super., at pp. 220, 221). Under the circumstances of the case sub judice, the single penalty for two offenses, when only one is affirmed, necessitates a remand to the Commission to impose an appropriate penalty for the violation sustained on appeal.
The findings of the Commission are affirmed as to the violation of subdivision (e) of N.J.S.A. 45:15-17, and are otherwise reversed, and the matter remanded for the sole purpose of determining the penalty to be imposed for the violation sustained.