The CHURCH OF THE NATIVITY
OF OUR LORD, Respondent,

v.

WATPRO, INC., Respondent,

and

Flag, S.p.A., a/k/a Flag S.A.S.
and Flag, Ltd.,

and MacArthur Company, Defendants,

and

Montedison, S.p.A., and Montedison
U.S.A., Inc., Appellants.

No. C5–91–99.

Supreme Court of Minnesota.

Oct. 23, 1992.

Corey J. Ayling, McGrann, Shea, Franzen, Carnival, Straughn & Lamb, Chartered, Minneapolis (Anthony Watkins, Mesirox, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., of counsel), for appellants.

Elizabeth Hoene Martin, Michael R. Doherty, Doherty, Rumble & Butler, P.A., St. Paul, for The Church of the Nativity of Our Lord.

John T. Chapman, Katharine L. MacKinnon, Arthur, Chapman, McDonough, Kettering & Smetak, Minneapolis, for WatPro, Inc.

WAHL, Justice.

Montedison, S.p.A., and Montedison U.S.A., Inc. (collectively Montedison) appeal a decision of the court of appeals, 474 N.W.2d 605, affirming a district court judgment finding Montedison liable for breach of express warranty, breach of contract, breach of implied warranty, negligent misrepresentation and violation of the Minnesota Prevention of Consumer Fraud Act (Consumer Fraud Act) and awarding damages. Montedison also appeals an order denying its post-trial motions and awarding attorney fees. The grounds of the appeal are that Montedison was entitled to but did not receive timely formal notice of defect as required pursuant to Minn.Stat. § 336.2-607(3)(a) (1990) and that this action is barred by the statute of limitations. The application of the Minnesota Consumer Fraud Act, Minn.Stat. § 325F.69 (1990), to the present circumstances is also challenged because 1) the Uniform Commercial Code (U.C.C.) provides the exclusive remedy; 2) the Consumer Fraud Act applies only to cases involving individual consumers; and 3) the Consumer Fraud Act is not violated by a negligent or unintentional misrepresentation. We affirm.

Respondent Church of the Nativity of Our Lord (Nativity) brought this action seeking to recover for damages resulting from defective roofing materials installed on Nativity's school and convent in 1980 and 1982. The facts of the case were found by the trial court based on the evi-

dence presented and the special verdict of the jury:

Montedison, S.p.A., a large Italian chemical corporation, developed and produced chemical compounds—Flagon SF and Flagon C (PVC pellets and powder)—which were transformed by Defendant Flag, S.p.A., under Montedison's direction and supervision, into membranes for use as roofing material. Montedison at all times maintained control of the chemical formulas. From the development of the formula through completion of the finished membrane, Montedison employees maintained quality control.[1]

Montedison U.S.A., a wholly owned subsidiary of Montedison, S.p.A., was involved in a joint venture with Montedison, S.p.A., to produce, develop, market and distribute Flagon roofing materials. Montedison U.S.A. coordinated all phases of marketing and distribution of the materials in the United States, including the use of the Montedison name.

Flag, S.p.A., an Italian corporation formed by former Montedison employees, is an agent of Montedison. A default judgment was filed in this action against Flag in January 1988.

The roofing materials used on Nativity's roofs were shipped through respondent WatPro, Inc., the sole distributor of Flagon roofing materials in the United States and the exclusive agent of Flag. As an agent of Flag, WatPro also was found to have an agency relationship with Montedison. The roofing materials were supplied by MacArthur Company[2] and installed on Nativity's buildings by Ampco, an approved Flagon roofing applicator and local roofing contractor who is not a party to this suit.

In 1979, Nativity retained the architectural firm of Voight & Fourre[3] to inspect parish-owned buildings and to identify and prioritize repair, rehabilitation, and maintenance needs. The architect recommended the reroofing of certain sections of the roofs of the convent and school as a high priority and later participated with the parish priest and finance council in the selection of materials and contractors for the job. Nativity selected the Flagon materials because of representations made in the product literature[4] that the Flagon materials would provide a watertight roof and because a ten-year guarantee was available.

About 60% of the work was to be completed in 1980, the remaining 40% in 1982. Two consecutive five-year guarantees were issued for the first work completed. In these documents Flag guaranteed that it would "maintain the Flagon roof * * * in a watertight condition at its own expense for a period of five years from this date provided that the owner gives WatPro, Inc., our exclusive agent, written notice of any leaks within 30 days from discovery of such leaks." The first guarantee covered the period September 4, 1980, to September 3, 1985, and was apparently provided at no additional cost. Nativity paid separately for the second guarantee which covered the period September 4, 1985, to September 3, 1990. For the work completed in 1982 Nativity purchased two more five-year guarantees containing identical promises by Flag, the first covering the period July 14,

---

1. In a letter from Montedison to Flag prepared at WatPro's request, Montedison details its role in the production of the Flagon materials and guarantees the quality of the final product. WatPro relied on this letter in deciding to become the exclusive agent for Flag in the United States.

2. MacArthur was at all relevant times the regional supplier of Flagon, supplying Flagon to the Midwest. MacArthur was dismissed from the case because the statute of limitations against it had run.

3. Voight & Fourre were named third-party defendants by Watpro but the claim against the firm has since been dismissed by stipulation of the parties.

4. Additional sales and product literature in the product sales booklet was based on information provided by Flag and Montedison. The content of the booklet was approved by both Flag and Montedison. The product literature included the following statement: "For every roof that fails ... there's a Flag/WatPro system that won't"; and "Flagon SF has a shrinkage factor of 0.5%; Flagon SF is resistant to ultraviolet rays, weathering, thermal shock, radiant heat, and exhibits excellent dimensional stability."

1982, to July 13, 1987, and the second covering the period July 14, 1987, to July 13, 1992. All of the guarantees contain the names of Flag, WatPro, and Montedison. The guarantees, drafted and approved by both Flag and Montedison, identified WatPro as the exclusive agent of Flag.

In September 1980, a leak was discovered in the roof of the convent. This leak was satisfactorily repaired under the guarantee though the source of the problem was not discovered. In 1982, new leaks were discovered. It was later determined that the Flagon material was the cause of the leaks. Evidence at trial established that the Flagon roofing materials were defective and that the defect was caused by plasticizer migration. Plasticizer is the chemical that makes the PVC flexible. The plasticizer migration, which occurs when an improper chemical formula is used, makes the Flagon brittle and susceptible to tears and shrinkage.

In 1984, WatPro was given written notice of the problem. WatPro promised repairs and extended the guarantees, but the Flagon materials continued to deteriorate. In November 1986, WatPro informed Nativity that Flag was refusing to honor its guarantees. In 1987, after consulting with experts, Nativity removed and replaced the roofs at its own expense. Nativity sustained substantial interior damage to the walls and ceilings of the convent and school.

Nativity began this lawsuit through service of process against Flag, WatPro and MacArthur in August 1987. A third-party complaint was served on Montedison on August 24, 1989, by WatPro.

The case was tried in Ramsey County District Court before a jury in July 1990.

At trial, the court granted Nativity's motion to allow direct claims against Montedison, granted motions by WatPro and MacArthur to bring crossclaims against Montedison, and granted motions by Montedison to bring cross-claims against WatPro and MacArthur.

By an exhaustive special verdict, the jury found Montedison liable to Nativity for breach of express warranty,[5] breach of contract, breach of implied warranty, negligent misrepresentation, and for violation of the Minnesota Consumer Fraud Act. The trial court entered judgment for Nativity in the amount of $358,613.54.[6] Based on the special verdict, the trial court dismissed with prejudice the claims against MacArthur and found WatPro to be entitled to full indemnity from Montedison.

We consider first whether the plaintiff satisfied the notice requirements of Minn. Stat. § 336.2–607(3)(a). That section provides that where a tender has been accepted "the buyer must within a reasonable time after the buyer discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Minn.Stat. § 336.2–607(3)(a).[7]

Montedison asserts that it was not informed of Nativity's claimed defect until it was served with a third-party complaint, seven years after the last installation and two years after the roof had been replaced. This, Montedison claims, constitutes inadequate and untimely notice, unreasonable as a matter of law. Montedison insists that, as a remote seller, it is entitled to formal notice of warranty defect, separate from and in addition to any notice given to an immediate seller. Montedison also argues that the evidence is insufficient to support the jury's finding that an agency relationship existed between itself and Flag or

---

5. The jury also found that the written guarantees issued to Nativity failed in their essential purpose of guaranteeing a watertight roof.

6. The trial court, based on the jury verdict, found damages of $10,993.22 for necessary repairs to the roof; $175,558.15 for replacing the Flagon roof; $5,700.90 for consequential and incidental damages for interior damage due to roof leakage; $12,159.91 for costs of investigation and $109,567.12 for reasonable attorney's fees under Minn.Stat. § 8.31 and Minn.Stat.

§ 325F.69, the Minnesota Consumer Fraud Act; and $44,634.15 prejudgment interest. Judgment was ordered in favor of Nativity for a total of $358,613.54 jointly and severally against Montedison, S.p.A., Montedison, U.S.A. and Watpro.

7. We later discuss the applicability of certain sections of the U.C.C. to consumers but note here that Minn.Stat. § 336.2–607(3)(a) applies to consumers as well as merchants.

WatPro for the purpose of receiving notice of the defect.

The notice requirement serves at least three purposes: "First, notice provides the seller a chance to correct any defect. Second, notice affords the seller an opportunity to prepare for negotiation and litigation. Third, notice provides the seller a safeguard against stale claims being asserted after it is too late for the manufacturer or seller to investigate them." *Prutch v. Ford Motor Co.*, 618 P.2d 657, 661 (Colo. 1980) (citations omitted).

■ Notification need not take a specific form. Oral notification for instance, satisfies the notice requirement. *American Fertilizer Specialists, Inc. v. Wood*, 635 P.2d 592, 596 (Okla.1981). *See also* James J. White & Robert S. Summers, *Uniform Commercial Code* § 11–10, at 558–59 (3d ed. 1988).

■ The sufficiency of notice of a breach of warranty is a jury question. *Northern States Power Co. v. ITT Meyer Industries*, 777 F.2d 405, 408 (8th Cir.1985). In deciding whether the notice requirement has been complied with, the jury must evaluate "the factual setting of each case and the circumstances of the parties involved." *Wagmeister v. A.H. Robins Co.*, 64 Ill. App.3d 964, 21 Ill.Dec. 729, 382 N.E.2d 23, 25 (1978). However, "[t]he content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." Minn. Stat.Ann. § 336.2–607 comment 4 (West 1966).

■ The notice requirement "is designed to defeat commercial bad faith, not to deprive a good faith consumer of his reme-dy." *Id.* The notice provision is not intended to "operate as a technical procedural barrier to deny claimants the opportunity to litigate the case on the merits." *Prutch*, 618 P.2d at 661. Where the record discloses prior knowledge of similar complaints, the defendant will already have investigated the possible causes and therefore cannot argue that it is prejudiced by any delay in receiving notice of the specific complaint. *Goldstein v. G.D. Searle & Co.*, 62 Ill.App.3d 344, 19 Ill.Dec. 208, 214, 378 N.E.2d 1083, 1089 (1978).

■ In its special verdict,[8] the jury found that Montedison had received actual notice of the defective condition within a reasonable time of the discovery of the defect. Montedison had prior knowledge of similar complaints. Similar defects had developed at over 350 other sites in North America. Officials from WatPro, Montedison and Flag met numerous times in the early 1980s to discuss the problems that were occurring in the field involving Flagon materials.[9] Flag and Montedison representatives told representatives from WatPro to use their own best judgment in responding to the developing problems, including authorizing repairs and extending guarantees. In addition, in response to the developing problems, Montedison altered the chemical formula and changed the type of backing used on Flagon SF.

■ The trial court, on the basis of the special verdict, found WatPro to be an agent of Flag with a resulting agency relationship between WatPro and Montedison for the purpose of receiving notice of defect.[10] An agency relationship is "the fiduciary relationship which results from the

---

**8.** The jury's verdict will not be disturbed if there is substantial evidence in the record that supports that verdict. *Northern States Power*, 777 F.2d at 408. "[A]n answer to a special verdict question will be set aside [on review] only if perverse and palpably contrary to the evidence, or where the evidence is so clear as to leave no room for differences among reasonable persons." *Jacobs v. Rosemount Dodge–Winnebago South*, 310 N.W.2d 71, 76 (Minn.1981).

**9.** Allen Bessemer, president of WatPro, passed information concerning specific problems to Flag and testified that he believed that Flag was passing this information on to Montedison. WatPro's technical advisor, Phillip DiFrancesco, stated that he had discussions with Montedison employees concerning problems with the product. He testified that there was no doubt in his mind that Montedison was aware of the problems.

**10.** In addition, the jury found that WatPro and Flag were joint venturers. The trial court found these findings to be inconsistent and held that the evidence better supported the agency relationship.

manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1 (1958). Whether an agency relationship exists is a question of fact "within the province of the jury." *High Forest Truck Stop, Inc. v. LaCrosse Petroleum Equipment Co.,* 364 N.W.2d 810, 812 (Minn.Ct.App.1985).

If an agency relationship is found to exist

a notification given to an agent is notice to the principal if it is given:

(a) to an agent authorized to receive it;

(b) to an agent apparently authorized to receive it;

(c) to an agent authorized to conduct a transaction, with respect to matters connected with it as to which notice is usually given to such an agent, unless the one giving the notification has notice that the agent is not authorized to receive it; [or]

(d) to an agent to whom by the terms of a contract notification is to be given with reference to matters in connection with the contract.

Restatement (Second) of Agency § 268.

■ Evidence in the record supports the jury's finding that an agency relationship existed between Montedison and Flag and Flag and WatPro. Written materials introduced at trial indicate that Montedison not only developed the methods used by Flag to produce the roofing membrane, but that Montedison directly supervised its production at the Flag facility. Montedison approved and controlled the content of all sales and product literature. In a letter that Montedison provided to WatPro, Montedison confirmed that it was "squarely behind this program, in the form of technical support, quality control, etc." WatPro received early, adequate, specific and repeated notice of the continuing problems.

Notice to WatPro is notice to Flag. Notice to Flag is notice to Montedison.

■ Montedison received timely and adequate notice through agency as well as actual notice of serious and continuing problems with the Flagon materials. In a breach of warranty claim, notice given by the buyer to the identified agent of a remote manufacturer is sufficient notice under Minn.Stat. § 336.2–607(3)(a), particularly where, as here, the guarantee specifically requires notice to the identified agent. We note that in a world made small by international trade the legislature has recognized that the burden is not solely on the consumer to identify all entities in the chain of distribution to obtain relief for damages caused by defective products. *See* Minn.Stat. § 604.04, subd. 1 (1990). We need not determine in this case whether a remote manufacturer is entitled to further notice of warranty defect under Minn. Stat. § 336.2–607(3)(a).

We next address the question of whether this action is barred by the statute of limitations. We hold that it is not. We affirm the court of appeals, finding that the complaints were served within the four-year statute of limitations.

■ Minn.Stat. § 336.2–725 requires that an action for breach of contract be commenced within four years after the cause of action has accrued.[11] The guarantees offered by Flag through WatPro extended to the future performance of the goods, expressly warranting that the roofs would remain watertight for ten years. Where there is such an explicit warranty, the cause of action accrues and the statute of limitations begins to run "when the plaintiff discovers or should have discovered the defendant's refusal or inability to maintain the goods as warranted in the contract." *Smith v. Union Supply Co.,* 675 P.2d 333, 335 (Colo.Ct.App.1983).

---

11. (1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued.
\* \* \* \* \* \*
(2) \* \* \* A breach of warranty occurs when tender of delivery is made, *except that where a warranty explicitly extends to future perfor-* *mance of the goods* and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered. Minn.Stat. § 336.2–725 (1990) (emphasis added).

In this instance, we find that the breach occurred in November 1986 when WatPro advised Nativity that Flag was unable or unwilling to honor its guarantee. The third-party complaint served on Montedison in August 1989 is well within the four-year statute of limitations.

Finally, we address the questions raised by Montedison as to whether Minn.Stat. § 325F.69, the Minnesota Consumer Fraud Act,[12] applies to all consumers and whether it may be violated by a negligent or unintentional misrepresentation. Montedison argues, among other things, that the contract remedies in the U.C.C. provide the exclusive remedy in this case. However, "[o]ne of the underlying policies of the U.C.C. is to differentiate between transactions involving casual buyers and sellers, or nonprofessionals, and those involving persons experienced in a particular field." Robert C. McClure, Minnesota Code Comment, Minn.Stat.Ann. § 336.2–104 (West 1966).

■ In the past, we have carefully distinguished between experienced commercial parties and ordinary consumer transactions when interpreting the U.C.C.: "[W]e continue to regard the Code remedies as something less than adequate in the ordinary consumer transaction." *Hapka v. Paquin Farms,* 458 N.W.2d 683, 688 (Minn. 1990). The U.C.C., as enacted in Minnesota, co-exists with other state statutes regulating sales to consumers.[13]

Montedison insists that the transaction at issue here is solely within the scope of the U.C.C. because Nativity is a "sophisticated merchant" in this transaction. Nativity, a Roman Catholic parish run by lay committees, is not ordinarily involved in commercial activity. Montedison's assertion can be based only on the employment, by the parish, of an architectural firm to advise them in rehabilitation and maintenance matters.

The U.C.C. does not provide a definition for the term "consumer." However, the U.C.C. defines the term "merchant":

"Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by employment of an agent or broker or other intermediary who by his occupation holds out as having such knowledge or skill.

Minn.Stat. § 336.2–104(1) (1990).

Comment 3 explains the final clause of the subdivision:

The "or to whom such knowledge or skill may be attributed by his employment of an agent or broker ..." clause of the definition of merchant means that even persons such as universities, for example, can come within the definition of merchant if they have *regular* purchasing departments or business personnel who are familiar with business practices and who are equipped to take any action required.

Comment, Minn.Stat.Ann. § 336.2–104 (West 1966) (emphasis added).

impose special obligations upon merchants but * * * do not apply to the casual or inexperienced seller or buyer * * *: sections 2–201(2), 2–205, 2–207, and 2–209, dealing with the statute of frauds, firm offers, confirmatory memoranda, and modification; section 2–314 on the warranty of merchantability; section 2–103(1)(b) concerning "good faith"; sections 2–327(1)(c), 2–603 and 2–605 dealing with responsibilities of merchant buyers to follow seller's instructions; section 2–509 on risk of loss; and section 2–609 on adequate assurance of performance.
Robert C. McClure, Minnesota Code Comment, Minn.Stat.Ann. § 336.2–104 (West 1966). These sections expressly state that they apply "between merchants."

12. We agree that an award of attorney fees depends on proof of a violation of the Minnesota Consumer Fraud Act. *See Hutchinson Utilities Comm'n v. Curtiss–Wright Corp.,* 775 F.2d 231, 238 (8th Cir.1985).

13. Unless the context otherwise requires, this article applies to transactions in goods; it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction *nor does this article impair or repeal any statute regulating sales to consumers,* farmers or other specified classes of buyers.
Minn.Stat. § 336.2–102 (1990) (emphasis added).
In addition, certain sections

It is clear from the comment that something more than hiring a consultant is required to move a noncommercial entity within the scope of the definition of "merchant." We hold that Nativity is not a "merchant" within the meaning of the U.C.C. The transaction at issue here is an ordinary consumer transaction within the scope of state statutes regulating sales to consumers.

■ Next, Montedison argues that the Consumer Fraud Act was intended to protect only *individual* consumers. The Act does not expressly limit its application to individual consumers. Nor has the Act been so interpreted by the courts. *See Hutchinson Utilities Commission v. Curtiss-Wright Corp.*, 775 F.2d 231 (8th Cir. 1985) (municipal utility recovers under the Minnesota Consumer Fraud Act); *Carlock v. Pillsbury Co.*, 719 F.Supp. 791 (D.Minn. 1989) (group of Haagen-Dazs franchisees properly stated a claim for relief under the Minnesota Consumer Fraud Act); *Eager v. Siwek Lumber & Millwork, Inc.*, 392 N.W.2d 691 (Minn.Ct.App.1986) (construction contractor bringing breach of warranty suit against a lumber company covered under the Minnesota Consumer Fraud Act).

The Consumer Fraud Act prohibits

> [t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby.

Minn.Stat. § 325F.69, subd. 1 (1990).

■ Montedison argues that a negligent misrepresentation does not trigger liability under the Minnesota Consumer Fraud Act. However, that argument need not be decided here because liability under the Act is triggered by the making of a false promise. The jury, by special verdict,

found that Montedison expressly represented that it would provide a watertight roof and that Montedison would maintain the roof in a watertight condition. The jury, by special verdict, found that Montedison failed to provide a roof in watertight condition and failed to maintain the roof in a watertight condition. In addition, the jury, by special verdict, found that Montedison knew or should have known that these guarantees would not be honored. The record is replete with evidence supporting these findings. We find these representations to be "false promises" prohibited by section 325F.69. The Minnesota Consumer Fraud Act, Minn.Stat. § 325F.69, applies to transactions involving all consumers and, in this case, was violated by the making of false promises.

■ Reliance by Nativity on these false promises directly caused damage to Nativity. Minnesota's private attorney general statute authorizes any person injured by a violation of Minn.Stat. § 325F.69 to bring a civil action to recover damages together with costs and disbursements, including costs of investigation and reasonable attorney's fees and other equitable relief. Minn.Stat. § 8.31, subd. 3a (1990).

The purpose of the private attorney general statute is to "eliminate financial barriers to the vindication of a plaintiff's rights * * * and to provide incentive for counsel to act as private attorney general." *Liess v. Lindemyer*, 354 N.W.2d 556, 558 (Minn. Ct.App.1984) (citations omitted). Nativity's pursuit of a remedy has involved much time and labor; it has been difficult, lengthy and expensive. If there are no attorney fees awarded in this case, Nativity will spend virtually all of its damage award paying its attorneys.[14] The private attorney general statute was intended to cover just this type of case. Attorney fees and costs were properly awarded.

---

14. The trial court awarded the following damages:

| | |
|---|---|
| Necessary roof repairs | $ 10,993.22 |
| Roof replacement costs | $175,558.15 |
| Water damage | $ 5,700.99 |
| Prejudgment interest | $ 44,634.15 |

The trial court awarded the following additional damages pursuant to Minn.Stat. § 8.31:

| | |
|---|---|
| Investigation costs | $ 12,159.91 |
| Attorney's fees | $109,567.12 |

Finally, Montedison argues that, because WatPro failed to give notice to its direct sellers—Flag and Montedison—it is not entitled to indemnification by Montedison.[15] There is ample evidence in the record that WatPro gave Flag, Montedison's agent, adequate notice of the specific problems involving Nativity's roofs. Indeed, Flag initially compensated WatPro for repairs made. The trial court properly ordered full indemnity to defendant WatPro from defendant Montedison.

We affirm the judgment of the court of appeals affirming the judgment of the trial court for the reasons set out in this opinion.

Affirmed.

SIMONETT, Justice (concurring in part and dissenting in part).

I join the court's opinion and agree with the affirmance, but I differ somewhat on the cause of action based on the Consumer Fraud Act, which is the basis for Nativity's claim for investigation costs and attorney fees.

Perhaps it is time to look more closely at the so-called "Private Attorney General Statute," Minn.Stat. § 8.31, subds. 1 and 3a (1990). Under subdivision 1, the attorney general is charged with investigating and assisting in the enforcement of laws "respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade * * *." Subdivision 1 lists some of the laws to be enforced and, among others, specifies the Consumer Fraud Act (Minn.Stat. §§ 325F.68–.70 (1990)). The Consumer Fraud Act prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, *false promise, misrepresentation,* misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise * * * " (emphasis added).

Subdivision 3a of the "Private Attorney General Statute" then provides an incentive for private parties and their counsel to assist the attorney general. It provides that *"any person injured* by a violation of any of the laws referred to in subdivision 1" may bring a civil action and recover not only damages and taxable costs but costs of investigation and attorney fees (emphasis added).

Read literally, "any person" means just that. But read in context, having in mind the purpose of the statute, "any person" means any consumer and excludes "merchants." The court's opinion properly so holds, as have courts elsewhere. *See, e.g., United States Welding, Inc. v. Burroughs Corp.,* 615 F.Supp. 554, 555 (D.Colo.1985); *Independent Communications Network, Inc. v. MCI Telecommunications Corp., Inc.,* 657 F.Supp. 785, 787 (D.D.C.1987). Unlike the attorney general who prosecutes in an official capacity, a consumer who wishes to be a "private attorney general" must show an injury; and, in this case, this means plaintiff must establish it sustained damages by reason of fraudulent business practices on the part of the defendants under the common law fraud count of its complaint.

A "false promise" is something different from a "misrepresentation." A "false promise" is a promise to do some act in the future, which promise the promisor did not intend to perform at the time the promise was made. *See, e.g., Maguire v. Maguire,* 171 Minn. 492, 496, 214 N.W. 666, 668 (1927); *Maple Hill Farms, Inc. v. Division of N.J. Real Estate Comm'n,* 67 N.J.Super. 223, 230, 170 A.2d 461, 464 (1961). In other words, a false promise is intentional misconduct. In this case plaintiff elected to plead and prove only a negligent misrepresentation. Indeed, section 4 of the verdict form is entitled "Negligent Misrepresentation." Moreover, plaintiff did not ask for separate jury interrogatories on intentional and negligent misrepresentation, *see Florenzano v. Olson,* 387 N.W.2d 168, 174 n. 5 (Minn.1986), but instead agreed to submission of a double-barreled special interrogatory asking if defendants knew or should

---

**15.** In addition, Montedison argues that WatPro, as a joint tortfeasor, is not entitled to a judgment of indemnity. However, we agree with the trial court's finding that the evidence better supports the agency relationship.

have known their statements were false and their guarantees would not be honored. Significantly, the parties here have accepted the jury's affirmative answer to this question (that the defendants "should have known") as a finding of negligent misrepresentation.

I would hold that a negligent misrepresentation has been proven, and that the Consumer Fraud Act covers negligent as well as intentional misrepresentations. Our court of appeals was of this view. *Yost v. Millhouse*, 373 N.W.2d 826 (Minn. App.1985). *See also Carlock v. Pillsbury Co.*, 719 F.Supp. 791, 849 (D.Minn.1989) (plaintiff need not prove misrepresentation was intentional to prevail under Minnesota's Consumer Fraud Act). The misrepresentation here, though not intentional, is made of one's own knowledge, without knowing if it were true or false; and it is this inexcusable lapse of communication that constitutes "fraudulent intent," *see Florenzano*, 387 N.W.2d at 174. This is the kind of fraudulent practice contemplated by the Consumer Fraud Act.

But there remains a further question: Is the misrepresentation the kind of misrepresentation that qualifies under the "Private Attorney General Act" for the recovery of investigation costs and attorney fees? Put another way, does every false promise, every misrepresentation, or every misleading statement carry with it an entitlement to attorney fees? I think not.

If the pertinent parts of sections 8.31 and 325F.69 are read together, as they must be,[1] it appears that the legislative intent is directed at deceptive practices to which the consumer public is prey, and that the legislature did not intend thereby to cover ad hoc deceptions arising in private disputes.

The Consumer Fraud Act was meant to protect consumers being hoodwinked by sales promotion scams. Because the attorney general's office does not have the resources to pursue all deceptive practices, and because an aggrieved consumer may lack the resources to sue, particularly when the claim is small and suit expense is high,

the legislature has authorized an award of attorney fees to give the disadvantaged consumer access to the courts and an incentive to assist in the curtailing of consumer fraud practices.

This is a worthy purpose, but there is some concern that enterprising plaintiffs, understandably interested in recovering investigation costs and attorney fees, may expand the Consumer Fraud Act beyond its intended scope. *See, e.g., Liess v. Lindemyer*, 354 N.W.2d 556, 558 (Minn.App. 1984); *Boland v. City of Rapid City*, 315 N.W.2d 496, 503 (S.D.1982); *cf. Martin v. Hancock*, 466 F.Supp. 454 (D.Minn.1979) (involving civil rights and 42 U.S.C. § 1988).

The common law rule in the United States is that litigants pay their own attorney fees, unless some contract or statute otherwise provides. The concern is that an aggrieved party, with a little ingenuity and provided it is a consumer, can convert almost any commercial transaction that fails into a case of "negligent misrepresentation," and then claim attorney fees, if successful. Oddly enough, the prevailing party recovers attorney fees (as in the English system), but only if the prevailing party is the plaintiff (unlike the English system). It seems to me, if there is to be a wholesale change in awarding attorney fees, it should be done by express legislation. A statute in derogation of well-established principles of common law should ordinarily not be extended by construction beyond its most obvious import. *Bubar v. Dizdar*, 240 Minn. 26, 28, 60 N.W.2d 77, 79 (1953).

The fact that protection against consumer fraud has traditionally been the responsibility of the attorney general; the fact that the statute is directed not at isolated fraud but deceptive "practices" which may be enjoined before they harm consumers; the fact that a consumer fraud violation does not require a plaintiff to be deceived as does a common law fraud action; and the fact that the plaintiff recovers the costs of investigation—all these factors lead to the conclusion that an attorney fee award

---

1. Originally, Minn.Stat. § 8.31, subd. 3a, was Minn.Stat. § 325.907, subd. 3a (1978), the same

chapter wherein the Consumer Fraud Act then appeared.

is not intended for so-called "private" disputes.

In my view, for there to be an attorney fee recovery for a violation of the Consumer Fraud Act:

1) the plaintiff must be a consumer, who is

2) injured by an actionable fraud (such as in a common law action for a false pretense, a false promise, or a misrepresentation), and

3) the fraud must have the potential to deceive and ensnare members of the consumer public other than just the plaintiff, so that

4) plaintiff's lawsuit has been of benefit to the public.

Some such requirements, it seems to me, would meet the worthy purposes of the "Private Attorney General Statute" while at the same time keeping the payment of investigation costs and attorney fees within reasonable bounds. Arguably, there should be a remand in this case for findings on the third and fourth requirements, but none has been requested, and I am not inclined to require it in this case. The record shows that defendants were widely marketing a defective roofing product with a standard form guarantee of a watertight roof and that there were some 320 complaints from customers. (It might also be noted the trial judge properly declined to award investigation costs and attorney fees to WatPro and MacArthur, the distributor and supplier of the Flagon material, because they "are not the types of consumers the statute was designed to protect.") So I, too, would sustain Nativity's verdict.

COYNE, Justice (concurring in part and dissenting in part).

I join in the concurrence in part and dissent in part of Justice Simonett.

TOMLJANOVICH, Justice (concurring in part and dissenting in part).

I concur with the partial dissent of Justice Simonett.

KEITH, Chief Justice (concurring specially).

While I find merit in the special concurrence's analysis of the question of investigative costs and attorneys fees, I do not think the question need be reached in this case and I would leave the matter for another time. Consequently, I join the majority opinion.