## METROPOLITAN LIFE INSURANCE COMPANY, Appellant,

v.

## M.A. MORTENSON COMPANIES, INC., Benson Industries, Inc., PPG Industries, Inc., Kohn Pedersen Fox Associates, P.C., CDC, Inc., Atlantic Richfield Company, Respondents,

Gateway Glass Company, Defendant,

### Carciofini Caulking Company, Respondent.

No. C9–95–2060.

Court of Appeals of Minnesota.

April 2, 1996.

Review Denied May 21, 1996.

Eric J. Magnuson, John M. Bjorkman, John B. Lunseth II, Rider, Bennett, Egan & Arundel, P.L.L.P. Minneapolis, MN, for Metropolitan Life Ins. Co.

James Duffy O'Connor, James F. Killian, Maslon, Edelman, Borman & Brand, P.L.L.P. Minneapolis, MN, for M.A. Mortenson Companies, Inc.

Dale B. Lindman, Mary W. Watson, Victor E. Lund, Mahoney, Dougherty, Mahoney, P.A., Minneapolis, MN, for Benson Industries, Inc.

Brian N. Johnson, Gary Parish, Popham, Haik, Schnobrich & Kaufman, Ltd. Minneapolis, MN, for PPG Industries, Inc.

Michael G. Taylor, Dwight A. Larson, Leonard, Street and Deinard, Minneapolis, MN, for Kohn Pedersen Fox Associates, P.C.

C. Todd Koebele, Thomas A. Gilligan, Jr., Murnane, Conlin, White & Brandt, P.A., St. Paul, MN, Ronald E. Martell, Moore, Costello & Hart, Minneapolis, MN, for CDC, Inc.

Russell A. Blanck, Larry D. Espel, Greene, Espel, Minneapolis, MN, for Atlantic Richfield Co.

Dan T. Ryerson, John E. Varpness, Gislason, Martin & Varpness, P.A., Minneapolis, MN, for Carciofini Caulking Co.

Considered and decided by HUSPENI, P.J., and PETERSON and HARTEN, JJ.

## OPINION

HUSPENI, Judge.

Respondents moved for and were granted summary judgment on the grounds that Minn.Stat. § 541.051, subd. 1(a), providing a two-year statute of limitations for improvements to real property, precluded appellant's

claims. Because both the injury and the breach of contract were discovered more than two years before the action was brought, we affirm.

## FACTS

Appellant Metropolitan Life Insurance Company (Met Life) is now the sole owner of the Metropolitan Centre (Centre), a 31–story office building whose defects are the subject of this action, which was commenced on April 19, 1994. There are seven respondents: M.A. Mortenson Companies, Inc. (Mortenson), the building's general contractor; Benson Industries, Inc. (Benson), installer of window and curtain wall systems; Kohn Pedersen Fox Associates (KPF), architect; PPG Industries, Inc. (PPG), manufacturer and supplier of windows; CDC, Inc. (CDC), consultant on curtain walls; Atlantic Richfield Company (ARCO), supplier of the window framing system; and Carciofini Caulking Company (Carciofini), supplier and installer of exterior caulking.[1]

### The water retention defect

The chief engineer, an employee of the building's then-owner, first observed and reported water coming down the insides of the windows of the Centre in late 1987 or early 1988. He observed this problem "more or less continuously" thereafter. The building's architect, respondent KPF, became aware of water penetration problems on the upper six floors of the Centre in 1988 and consulted respondent CDC to investigate. Ralph Ellerbrock of CDC issued a report attributing the water damage to condensation and stating that the problem would resolve itself as the concrete in the building dried out and occupancy increased. When Met Life received a copy of Ellerbrock's 1988 report, it decided to withhold part of the payments it owed Mortenson, the general contractor. Ellerbrock was again retained to inspect building in 1991 and again reported condensation. Met Life received his 1991 report.

Because the problem continued, Met Life hired its own consultants to inspect the building in 1992. Their April 1992 report showed defects in the installation of the building's vapor barrier. In 1994 they issued another report, finding that because the drainage slots were too small, water leaving the building froze, plugged the slots, and prevented further drainage.

### The spandrel window defect

The building's spandrel windows were designed to be opaque; they are composed of an exterior glass layer, then a metallic reflective layer laminated to the glass, and finally an opacifier film. As the opacifier layer chipped and peeled away from the windows, they ceased to be opaque and revealed unsightly construction.

Early in 1990, a window-washing crew informed Met Life representatives about defects in the spandrel windows. The 1991 Ellerbrock report also stated that the opacifier was delaminating or losing its adhesion, and a consultant hired by Met Life recommended in March 1992 that all the spandrel units be replaced. When respondent PPG, which manufactured and supplied the windows, was informed of the problem in late March or early April 1992, it first denied there was a problem, then claimed it had no information; it did not promise to repair or replace the windows.

## ISSUE [2]

■ Does Minn.Stat. § 541.051 bar an action brought more than two years after the discovery of an injury?

## ANALYSIS

On appeal from summary judgment, this court asks whether there are any issues of material fact and whether the district court erred in its application of the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn. 1990).

---

1. Defendant Gateway Glass Company took no part in this appeal.

2. All parties agreed to limit initial discovery to the two-year statute of limitations issue, which was the only issue the district court addressed.

Because this court may consider only issues presented to and considered by the district court, *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988), we do not address the other issues raised by some of the respondents.

The relevant statute in this case is Minn. Stat. § 541.051, subd. 1 (1990), providing that:

(a) * * * [N]o action by any person in contract, tort, or otherwise to recover damages for any injury to property * * * arising out of the defective and unsafe condition of an improvement to real property * * * shall be brought against any person performing or furnishing the design, planning, supervision, materials, or observation of construction or construction of the improvement to real property * * * more than two years after discovery of the injury * * *.

(b) * * * *[A] cause of action accrues upon discovery of the injury * * *.[3]

Because Met Life makes different arguments with respect to the application of the statute to each defect, we will consider the defects separately.

### 1. The water retention problem.

Met Life asserts that its April 19, 1994, action is not barred because it did not discover the design and installation defects responsible for this problem until April 20, 1992, when it received the report of its own expert. Met Life raises three arguments: first, that the "discovery of the injury" language does not apply when an injury could have more than one cause; second, that summary judgment is not appropriate because the record does not clearly show that Met Life discovered the injury more than two years before commencing the action; and third, that summary judgment is precluded because the determination of when a statute of limitations begins to run is a fact issue. We find no basis for relief in any of these three arguments.

■ Met Life agrees that it is generally true that discovery of the injury begins the running of the statute, but cites Hyland Hill N. Condominium Ass'n, Inc. v. Hyland Hill Co., 538 N.W.2d 479 (Minn.App.1995), review granted (Minn. Nov. 30, 1995), to argue that if an injury could have more than one cause, it is discovery not of the injury but of the cause that begins the statutory period. While Hyland Hill is not precisely on point,

since a different statute of limitations applied there, id. at 483, dicta in that case observed that the limitation period on an action to replace a roof did not begin to run until the plaintiff was aware of the need for replacement; discovery of sporadic leaks did not give rise to a cause of action because the plaintiff did not know the "true nature of its injury." Id. at 484. Met Life argues that it did not know the true nature of its injury until 1992.

Hyland Hill is distinguishable from this case. The roof leakage in Hyland Hill was initially only sporadic and was handled by minor repairs. Id. at 482. The plaintiff took reasonable steps to remedy the problem and, when the leak became extensive and irreparable, brought an action within a year. Id. Here, the water damage was frequent and continual from 1987 on; Met Life was informed in 1988 and again in 1991 that the problem was condensation in the vapor barrier. Met Life considered the water drainage problem to be very significant: it used the problem as a basis for denying retainage payments to the general contractor in 1988; its own architect was aware of the problem in 1989; and its own engineer attempted to resolve it by altering the heating, ventilation, and air conditioning system in 1990. Met Life's reliance on Hyland Hill is misplaced.

■ Met Life next cites City of Willmar v. Short–Elliott–Hendrickson, Inc., 475 N.W.2d 73, 78 (Minn.1991), to argue that summary judgment under Minn.Stat. § 541.051 is not appropriate because the record does not clearly demonstrate that the discovery of the grounds for the cause of action occurred more than two years prior to commencing suit. In City of Willmar, a city sued the designer of waste disposal units because of odors emanating from the units. Many facts obscured the discovery of the cause of action: the designer consistently maintained that the problem was not a design defect but excessive industrial waste; a consultant assured the city that the system was properly designed and constructed and could be adjusted to control the odor; the city's engineer reported that there were not sufficient facts to

---

3. Subdivision 1(b) was added to the statute by a 1988 amendment.

attribute the problem to the designer; the city's engineering department finally identified the disposal units as the source of the odors but did not identify flaws in their design or operation; and the city brought its action within eight months of retaining a consultant to determine whether the design of the disposal plant was adequate. *City of Willmar*, 475 N.W.2d at 78. These facts do not support a determination that discovery of the injury occurred more than two years before the cause of action accrued and are easily distinguishable from the facts here. Met Life was informed and acknowledged that its injury was condensation in 1988 and again in 1991. The district court properly concluded that Met Life discovered its injury more than two years before bringing its action.

■ Met Life also argues that when the statute began to run is a fact issue that precludes summary judgment and again cites *Hyland Hill:* "when reasonable minds may differ about the discovery of the injury or condition, the issue is one for the trier of fact." 538 N.W.2d at 484 (quoting *Lake City Apartments v. Lund–Martin Co.*, 428 N.W.2d 110, 112 (Minn.App.1988), *review denied* (Minn. Oct. 19, 1988)). *Lake City* has a fact pattern similar to *Hyland Hill:* leaks occurred occasionally over ten months; the plumbing was altered and no further leaks appeared for two years; leaking then recommenced, and it was discovered that all the plumbing in the building might be defective. *Lake City*, 428 N.W.2d at 112. The facts here do not include a temporary solution or cessation of the injury. The building engineer testified that he observed the condition "more or less continually" after late 1987 or early 1988. Met Life's water problem was neither intermittent nor thought to be insignificant, and its discovery occurred more than two years before Met Life brought this action.

### 2. *The spandrel glass problem.*

Met Life argues that Minn.Stat. § 541.051 does not apply because the spandrel glass was not in a defective or unsafe condition and because respondent PPG warranted that the spandrel glass would not peel for ten years. Both arguments fail as a matter of law.

### a. **Defective or unsafe condition**

■ *Griebel v. Andersen Corp.*, 489 N.W.2d 521 (Minn.1992), construes the phrase "defective and unsafe condition." The supreme court noted initially that

> we have used the phrase as a collective, with its individual terms often interchanged depending upon the facts or circumstances in which the statute has been invoked.

*Id.* at 523 (citations omitted). *Griebel* concerned a patio door, defective in that it admitted flies. After concluding that this was an unsafe condition, the court analyzed the legislature's purpose in setting the statute of limitations.

> A window or door which fails to provide the expected barrier against unwanted elements such as rain or snow or living creatures such as flies or mosquitoes is insecure or unsafe * * *.

> * * * [I]t seems to us highly unlikely that the legislature would limit the time for bringing an action to two years if the offending improvement is not only defective but in addition presents a risk of bodily injury but expand the time for instituting an action to six years if the improvement is merely defective and poses no risk of bodily harm. Because the consequence of the restrictive definition of "unsafe" adopted by the court of appeals is to credit the legislature with the intent to achieve an absurd result—to provide a longer limitation period with respect to a claim arising out of a defect which poses no risk of bodily harm than for a claim arising out of a defect which has caused bodily harm, * * * we recognize alternative definitions of "unsafe" such as "insecure" and thus implement the legislature's sensible intention to provide one limitation period for claims arising out of defective and unsafe improvements to property regardless whether the defect is hazardous to human health or whether the defect simply renders the property insecure and vulnerable to invasion.

*Id.* Here, the spandrel windows were intended to be opaque and to conceal structural materials; the fact that light could penetrate what was designed to be impenetrable and illuminate what was designed to be concealed makes the spandrel windows "insecure" or unsafe within the meaning of the statute.[4] Met Life cannot narrowly interpret "defective or unsafe" to avoid application of Minn. Stat. § 541.051.

#### b. The warranty

■ Minn.Stat. § 541.051, subd. 4, provides that:

> This section [Minn.Stat. § 541.051] shall not apply to actions based on breach of the statutory warranties set forth in section 327A.02, or to actions based on breach of an express written warranty, provided such actions shall be brought within two years of the discovery of the breach.

There appears to be no Minnesota case law on the relationship between the Minn.Stat. § 541.051, subd. 4, requirement that actions based on breach of express warranty must be brought both within two years of the discovery of the breach and within the stated duration of express warranty provisions. A review of Minn.Stat. § 336.2–725 and case law construing its provisions, however, is instructive. Section 336.2–725 (1994) sets forth a statute of limitations for actions on warranties on contracts for sale and provides that:

> (1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to less than one year but may not extend it.
>
> (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such perfor-

mance the cause of action accrues when the breach is or should have been discovered.

In *Church of the Nativity v. WatPro,* 491 N.W.2d 1 (Minn.1992), the Minnesota Supreme Court construed the language of this statute as follows:

> Minn.Stat. § 336.2–725 requires that an action for breach of contract be commenced within four years after the cause of action has accrued. The guarantees * * * extended to the future performance of the goods, expressly warranting that the roofs would remain watertight for ten years [from 1980 to 1990 for one roof, and 1982 to 1992 for the other]. Where there is such an explicit warranty, the cause of action accrues and the statute of limitations begins to run when the plaintiff discovers or should have discovered the defendant's refusal or inability to maintain the goods as warranted in the contract. In this instance, we find that the breach occurred in November 1986 when [the distributor] advised [the building owner] that [the manufacturer's agent] was unable or unwilling to honor its guarantee. The third-party complaint served on [the manufacturer] in August 1989 is well within the four-year statute of limitations.

*Id.* at 6–7 (footnote and quotation omitted).

■ In order for section 336.2–725 to be internally consistent, the provision that parties may not extend the period of four years after discovery of the breach must preclude actions not brought within that period, even if they are brought within the time span of an express warranty. Although the products in *WatPro* were warranted until 1990 or 1992, it was not the warranty period but the statutory limit that the court found dispositive. The action in *WatPro* went forward not because it was brought within the extended warranty period, but because it was brought within the statutory limit. *Id.* While the warranty of future performance does alter

---

4. Met Life cites *Arden Hills N. Homes Ass'n v. Pemtom, Inc.,* 475 N.W.2d 495 (Minn.App.1991), *aff'd as modified,* 505 N.W.2d 50 (Minn.1993), to argue that an aesthetic defect does not mean a building is also "unsafe." The supreme court explicitly rejected that argument, ordering that

*Arden Hills* "be, and the same is, affirmed as modified in accordance with *Griebel v. Andersen Corp.,* 489 N.W.2d 521 (Minn.1992)." *Arden Hills N. Homes Ass'n v. Pemtom,* 505 N.W.2d 50 (Minn.1993).

the time when the cause of action accrues, it does not replace or alter the statutory time limit for bringing the action.[5]

█ While the provisions of Minn.Stat. § 541.051, subds. 1 and 4, rather than those of section 336.2–725, apply in this case, we conclude that a similar analysis is indicated: both statutes involve situations where a warranty period runs concurrently with a statutory limitation. Here, as in *WatPro*, the goods are warranted for ten years. Unlike the building owner in *WatPro*, however, Met Life did not bring the action within the relevant statutory period, i.e., two years after discovery of breach, as mandated by Minn. Stat. § 541.051, subd. 4.

Met Life was informed in the 1991 Ellerbrock report that the spandrel glass was defective and that PPG, its manufacturer, should be called in to solve the problem. When PPG was called in, it made no promise to repair the glass. Instead, it claimed at one point that it had no reason to suspect a problem with the glass and at another point that it had no information indicating a defect. The individual whom Met Life identified as its "point person" on warranties testified that after inspecting the building in March or early April 1992, he told Met Life that he had communicated with PPG about the problem and that PPG did not promise to repair or replace the glass. The fact that PPG was breaching its contract was discovered, or should have been discovered, at least by early April 1992, more than two years before it brought this action.

## DECISION

Because Met Life did not bring this action for more than two years after discovering its injuries and the breach of PPG's contract, the action is barred by the statute of limitations.

**Affirmed.**

**5.** Cases from foreign jurisdictions are in accord. *See, e.g., Executone Business Sys. Corp. v. IPC Communications, Inc.* 177 Mich.App. 660, 442 N.W.2d 755 (1989); *Smith v. Union Supply Co.,* 675 P.2d 333 (Colo.App.1983); *U.S. Indus., Inc. v. Mitchell,* 148 Ga.App. 770, 252 S.E.2d 672 (1979); *Kelly Tractor Co. v. Gurgiolo,* 369 So.2d 992 (Fla.App.1979).