**Hoang Minh LY d/b/a Lee's Garden, petitioner, Appellant,**

v.

**Kim NYSTROM, et al., Respondents.**

No. C6–99–565.

Supreme Court of Minnesota.

Aug. 3, 2000.

Barbara R. Kueppers, Mpls., Ksenia Rudensiuk, St. Paul, for appellant.

Stephen William Hance, Martin & Squires, P.A., St. Paul, for respondents.

Mike Hatch, Atty. Gen., Prentiss Cox, St. Paul, for amicus curiae State of Minn.

Thomsen & Nybeck, P.A., Donald D. Smith, David J. McGee, Edina, for amicus curiae Minn. Assn. of Realtors.

Will Mahler Law Office, Will Mahler, Rochester, for amicus curiae Council on Asian-Pacific Minnesotans.

Meagher & Geer, P.L.L.P., William H. Hart, Thomas E. Propson, Jenneane L. Jansen, Minniapolis, for amicus curiae Legal Aid Society of Minneapolis.

Winthrop & Weinstein, P.A., Thomas H. Boyd, Charles Schoenwetter, St. Paul, for amicus curiae Southern Minnesota Regional Legal Services.

Lind, Jensen, Sullivan & Peterson, P.A., William L. Davidson, Minneapolis, for amicus curiae Minn. Defense Lawyers Assn.

## OPINION

STRINGER, Justice.

During negotiations between appellant Hoang Minh Ly and respondent Kim Nystrom for the purchase of respondent's restaurant, respondent made misrepresentations to appellant relating to monthly profits and the condition of the restaurant and its inventory. The restaurant never made a profit and discussion between the parties led to a contract cancellation. Appellant then brought suit alleging common law fraud and a violation of Minnesota's Consumer Fraud Act (CFA), Minn.Stat. § 325F.69, subd. 1 (1998), and included a claim for attorney fees under the Private Remedies section of the Attorney General Statute (Private AG Statute), Minn.Stat. § 8.31, subd. 3a (1998). The trial court ruled that respondent defrauded appellant and awarded him a common law fraud damage remedy but denied his motion for attorney fees finding that there was no

violation of the CFA because respondent's representations were not made to a large number of consumers. The court of appeals affirmed. *See Ly v. Nystrom,* 602 N.W.2d 644, 647 (Minn.App.1999). We reverse in part and affirm in part.

In 1981 appellant Hoang Minh Ly came to the United States from Vietnam at the age of 32. When first arriving in the U.S. he worked in various Chinese restaurants as a dishwasher and cook's assistant, positions neither requiring nor providing any business or management experience. In 1989 he met respondent Kim Nystrom while employed as a cook's assistant and she as a waitress at May Ninh restaurant in Maple Grove. Appellant speaks, reads and writes very little English and his formal education ended in Vietnam at the second grade. Respondent is also from Vietnam but speaks and reads English.

A few weeks after the two met respondent left the May Ninh restaurant to work at another restaurant, and between 1990 and 1995 appellant and respondent spoke periodically regarding jobs at various restaurants, including a Shakopee restaurant called Chin Yung, the subject of this litigation. In June of 1996 respondent told appellant she had bought the Chin Yung in 1994 and that she was having trouble hiring people, she wanted to sell the restaurant and encouraged him to consider buying it.

A few days later, on approximately June 14, 1996,[1] appellant visited the restaurant before it opened in the morning. Respondent told appellant "this is a very good place, and it's a good business," and that she would sell the restaurant for $100,000. Appellant called the next day asking respondent to lower the price; she refused, warning him that someone else wanted to buy it so if he was interested he should decide soon. Respondent then represented to appellant that the restaurant's estimated monthly gross revenue was between $25,000 and $30,000 and the monthly profits between $6,000 to $7,000. Respondent told appellant it was a good business and that she would not trick him because they were friends.

The next day, approximately June 15, appellant and his wife went to the restaurant at about 8:00 p.m. The restaurant was not busy and when appellant asked why there were so few patrons respondent replied that customers in Shakopee usually eat and go to sleep earlier because they commute to work. When appellant's wife asked to see the books respondent said that they were not there but a lawyer did not need to review them because she would not lie to appellant. Respondent agreed to lower the purchase price from $100,000 to $90,000 with a cash down payment of $20,000. She also agreed to charge appellant $2,000 a month for rent, $1,200 a month for taxes and a 9% interest rate on the business loan. That night appellant decided to buy the restaurant because he thought $90,000 was a fair price to pay for a restaurant taking in $25,000 to $30,000 a month and because he trusted that respondent would not misrepresent the business.

On June 19, 1996, the parties met again and appellant's wife wrote a check for $5,000, leaving blank the payee designation on the check at respondent's request. The remaining $15,000 was to be paid before June 30. Appellant wanted to show his lawyer the agreement but decided not to do so after respondent assured him that he did not need a lawyer because they were friends and she would not cheat him. When the check was returned to appellant the payee was designated "Anderson Produce."

On June 25, 1996, at around 2:00 p.m. the parties met to sign the lease agreement and promissory note, which respondent prepared, and she again told appellant he did not need a lawyer. Appellant signed the documents without reading

1. The exact dates of the next few meetings are not clear from the record but they took place between approximately June 10, 1996 and June 19, 1996.

them and respondent did not review the documents with him.[2]

At the closing on June 30, 1996, appellant delivered checks for the down payment balance–one for $10,000 and another for $5,000–and respondent again asked appellant to leave the payee designations blank.[3] Appellant also bought food inventory from respondent for $3,990.27 but a few days later about 50% of the meat and all of the shrimp was unusable and about 60% of the canned food was unusable because the cans were swollen. Respondent agreed to reduce the purchase price of the inventory by subtracting the value of the unusable food but the parties could not agree on the amount of the reduction. Appellant estimated the inventory to be worth a little over $1,000.

Appellant retained the original menu, the sign and the lunch buffet for a couple of weeks after opening the restaurant but took in only a little over $200 daily. When appellant told respondent that the restaurant was not taking in $700 a day she suggested that he change the sign, menu and buffet. Appellant followed the suggestions and with radio ads and coupons business increased slightly but profits did not increase. The restaurant never made $700 a day and never turned a profit. Appellant estimated his sales per month to be about $6,000 to $7,000, not the $25,000 to $30,000 respondent represented. The physical facilities presented additional problems with the plumbing backed up, the refrigerator and dishwasher not working, the roof leaking, faulty wiring and a parking lot with many potholes. Respondent later told appellant that this may be his fate and to see a fortune teller. She also told him that she would lower his rent but she never did.

Appellant paid respondent about $4,000 in July and August but as his loans increased the amount he could pay decreased–to $3,000 in September, $1,000 in October and $1,000 in November. Respondent refused his offer of a payment of $1,000 for December, warning him that he owed her three months rent and she was going to evict and sue him. In December, respondent called almost every day to ask for payment and told appellant that if he did not give her back the restaurant she would take him to court where he would lose his credit and his home would be seized. During this period appellant was able to keep the restaurant open by running up a $45,000 credit card debt and borrowing approximately $30,000 from friends and family.

On December 22, 1996, an insurance agent went with respondent to the restaurant "with papers * * * declar[ing] the contract null." When appellant said that he wanted his lawyer to evaluate the papers respondent told him that if he did not sign the papers by the next day "the police will come and lock the doors and you cannot bring anything out of the restaurant. And if you try to get in, they will take you away. They will lock you up."

The next day, December 23, 1996, respondent went to appellant's house, again with an insurance agent, and told him that he either had to pay her the full amount he owed or sign a contract stating that all prior contracts were cancelled, and if he did not do either she would take appellant to court because his rent was three months late. Appellant signed the contract declaring all prior contracts "null." Respondent also gave appellant a check for $2,500 to help him pay bills and support his family, but she stopped payment on the check.[4]

---

**2.** After taking copies of the documents home appellant noticed that the promissory note listed the restaurant price as $70,000, not $90,000 and after he notified respondent she revised the promissory note to reflect the $20,000 down payment.

**3.** Respondent later made the $10,000 check payable to her son and the $5,000 check payable to herself.

**4.** Respondent testified that she stopped payment on the check when she went to the restaurant on December 24, 1996, and appel-

Respondent sold the restaurant to another purchaser later that day.

Appellant filed a complaint on October 21, 1997 alleging, among other counts, that respondent defrauded appellant and violated the CFA, and requested damages in excess of $50,000, attorney fees and costs pursuant to the Private AG Statute and pre- and post-judgment interest. After a three-day trial the court ruled that respondent defrauded appellant and that the value of the restaurant was $65,000 at the time of the sale. The court applied the damage award formula for common law fraud–the difference between what appellant paid for the restaurant and the fair market value of the restaurant, plus damages resulting from reasonable attempts to mitigate–and reasoned that since appellant bought the restaurant for $90,000 and the fair market value of the restaurant was $65,000, appellant was entitled to judgment for $25,000.[5] The court made no ruling regarding application of the CFA or the Private AG Statute in this order.

On November 9, 1998, appellant moved for costs and attorney fees pursuant to the CFA and the Private AG Statute, claiming $60,920.55. The trial court denied the motion on the basis that appellant's award was based on a common law fraud finding which provided no right to recover attorney fees and the CFA did not apply because respondent's representations were not made to a large number of consumers and did not have the potential to deceive or ensnare any other consumer. With no violation of the CFA, the court ruled that appellant could not recover attorney fees under the Private AG Statute.

The court of appeals affirmed both the finding of common law fraud and the ruling that appellant had no cause of action under the CFA, noting that appellant did not meet the definition of "consumer" because he bought the restaurant with "the intent to produce, manufacture, and resell food, rather than with the intent of direct ownership of the product." *Ly*, 602 N.W.2d at 646–47. As to application of the CFA, the court held that it "only applies in consumer fraud situations and the fraud or misrepresentation must be disseminated to others." *Id.* The court concluded that this was a one-on-one business transaction and that if the court were to adopt appellant's interpretation of the CFA, the CFA would provide remedies for virtually every fraudulent transaction, an expansion of the statute not contemplated by the legislature. *See id.* Finally, the court denied appellant's request for prejudgment interest of $1,265.40 because the district court did not rule on the issue. *See id.*

■ On review here, we address de novo as a matter of statutory interpretation appellant's argument that as a victim of common law fraud he has a cause of action under the CFA and is entitled to attorney fees and costs under the Private AG Statute. *See Hibbing Educ. Ass'n v. Public Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn.1985). We are guided by the principle that the object of all statutory interpretation and construction of law is to ascertain and effectuate the intent of the legislature, *see* Minn.Stat. § 645.16 (1998), and we recognize the broad legislative powers in the passage of laws relating to preserving and protecting the public from mischievous business practices, *see State v. Crabtree Co.*, 218 Minn. 36, 40, 15 N.W.2d 98, 100 (1944). The CFA and Private AG Statute are legislative enactments of this nature and are generally discussed and applied in concert, but they are separate and distinct in their structure and purpose–thus we analyze them separately.

lant had taken all of the inventory and left the restaurant a mess.

**5.** The court also held that appellant was not entitled to the return of rent payments because the rent was set at the fair market value for Shakopee, and that he was not entitled to reimbursement for credit card advances and loans from relatives because those items were not reasonable expenditures in mitigating damages.

## I. The Consumer Fraud Act

In the late 1950's many state legislatures enacted statutes designed to prohibit deceptive practices and to address the unequal bargaining power often present in consumer transactions. *See* Jeff Sovern, *Private Actions Under the Deceptive Trade Practices Acts: Reconsidering the FTC Act as Role Model,* 52 Ohio St. L.J. 437, 446 (1991). By 1981, every state in the United States had statutes providing for consumer protection enforcement by a state agency–commonly, as in Minnesota, the state attorney general–with broad enforcement authority. *See id.* Minnesota's Consumer Fraud Act was adopted in 1963 [6] to achieve the same purpose and provides the attorney general with authority to seek and obtain injunctive relief to protect consumers from unlawful and fraudulent trade practices in the marketplace. *See State v. Philip Morris, Inc.,* 551 N.W.2d 490, 496 (Minn.1996) (stating consumer protection statutes "are generally very broadly construed to enhance consumer protection"). The CFA provides in relevant part:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided herein.

Minn.Stat. § 325F.69, subd. 1.

The CFA defines "merchandise" as "objects, wares, goods, commodities, intangibles, real estate, loans, or services." Minn.Stat. 325F.68, subd. 2 (1998). The word "consumer" appears nowhere in the CFA, however the statutory purpose of protecting consumers was clear from its inception when it was presented to the legislature in 1963:

> In most areas, the proper way to solve consumer problems is to educate the consumer; there are, however, other areas where the complication of the problem, or the peculiar nature of the consuming public involved, makes it necessary for the state to protect the consumer.
> * * * *
> [This bill] is designed to expand the powers of the state to deal with fraud, deception, and misrepresentation in connection with the sale of merchandise. * * * [T]he intrastate practice of fraud has grown into a field of great profit and great damage both to individual citizens and to honest businessmen.[7]

■ We recently observed that the CFA "reflect[s] a clear legislative policy encouraging aggressive prosecution of statutory violations" and thus should be "generally very broadly construed to enhance consumer protection." *Philip Morris, Inc.,* 551 N.W.2d at 495–96 (holding that Blue Cross and Blue Shield of Minnesota, a health care provider, had standing to pursue claims under the CFA for increased costs incurred in medical and hospital care of insureds with tobacco-related illnesses). We have also noted that the CFA is remedial and should be liberally construed in favor of protecting consumers. *See Boubelik v. Liberty State Bank,* 553 N.W.2d 393, 402 (Minn.1996); *see generally Governmental Research Bureau, Inc. v. Borgen,* 224 Minn. 313, 323, 28 N.W.2d 760, 766 (1947).

Our recent decisions bear out this broad and flexible application of the CFA. In *Church of Nativity of Our Lord v. WatPro Inc.,* the respondent alleged that the appellant, a large chemical corporation, violated the CFA when it produced and installed defective roofing materials on

---

**6.** Act of May 23, 1963, ch. 842, § 1, 1963 Minn. Laws 1533, 1534.

**7.** Special Message, 63rd Minn. Leg., Apr. 23, 1963 (audio tape) (comments of Governor Rolvaag).

Church of Nativity's school and convent. 491 N.W.2d 1, 3–4 (Minn.1992). We rejected the appellant's argument that because the church was a "sophisticated merchant," remedies under the Uniform Commercial Code were exclusive. *See id.* at 8. We held that a church run by lay committees was not ordinarily involved in commercial activity and that it took something more than hiring an architectural consultant, as Church of Nativity did in this case, to bring a noncommercial entity within the meaning of the Uniform Commercial Code's definition of "merchant." *See id.* at 7–8. We observed that the CFA is not expressly limited to individual consumers and has not been interpreted that way by the courts, thus it "applies to transactions involving all consumers and, in this case, was violated by the making of false promises." *Id.* at 8. We concluded the transaction was "an ordinary consumer transaction within the scope [of the Act]." *Id.*

In *Boubelik,* we interpreted the CFA more narrowly where the plaintiffs, who obtained a loan from a bank, alleged that the bank violated the CFA by defrauding them in connection with the loan. 553 N.W.2d at 402. The issue before us was whether the term "merchandise" or "services" included bank loans.[8] *See Boubelik,* 553 N.W.2d at 402. We held that the legislature could have specifically referred to loans within the definition of "merchandise" but did not do so, thus bank loans did not fall within the meaning of "services" under the CFA. *See id.* at 403. We reasoned, "[p]ublic policy not only includes protection for consumers who enter certain transactions in an unequal bargaining position, but it also includes the freedom for sophisticated parties to borrow and to invest moneys subject to certain risks." *Id.*[9] Less than a year later in 1997, the legisla-

ture amended the definition of "merchandise" to include loans.[10]

■ Appellant and amicus first note that the CFA is to be interpreted liberally and if its breadth is narrowed it should be by legislative enactment, not by judicial decision. Appellant argues that Minn.Stat. § 325F.68, subd. 3 (1998), defines "person" to include corporations and other organizations and "does not expressly limit its application to individual consumers," *Church of Nativity,* 491 N.W.2d at 8, citing the parish in *Church of Nativity* and Blue Cross and Blue Shield of Minnesota in *Philip Morris, Inc.* as precedent. Appellant similarly points out that the CFA applies to single transactions, as in *Boubelik* and *Church of Nativity,* and that we have never held that the fraud under the CFA must be broadly disseminated. Appellant observes that no language in the CFA limits "persons" to those buying for personal use only and such a reading excludes consumers who can be the primary target of consumer fraud, a sole proprietor purchasing a first computer, for example. Finally, appellant argues that the purpose of the CFA is to level out the unequal bargaining power in marketplace transactions.

Respondent contends that the legislature did not intend the CFA to apply to non-consumer commercial transactions, as here, where appellant was a veteran of the restaurant business, had substantial bargaining power in the transaction and clearly purchased the restaurant for commercial, not personal, use. Respondent reads the use of "others" in the CFA language "with the intent that *others* rely thereon" to require the fraud to be perpetrated on others in addition to the plaintiff. Minn. Stat. § 325F.69, subd. 1.

---

8. In 1996 the word "loan" was not included in section 325F.68 definitions. *See* Minn.Stat. § 325F.68, subd. 2 (1996).

9. Justices Gardebring and Page dissented on the ground that the CFA was broad enough to

include loans. *See Boubelik,* 553 N.W.2d at 405 (Gardebring, J. and Page, J., dissenting).

10. *See* Act of May 16, 1997, ch. 157, § 60, 1997 Minn. Laws 965, 996.

■ We agree with appellant that the better reasoning leads to the conclusion that the transaction involving the sale of the Chin Yung restaurant is covered by the CFA. Appellant purchased the restaurant business not for the purpose of reselling it, but rather to sell restaurant services. His status was therefore more that of a consumer of the restaurant business than a buyer of a business for resale. *See, e.g., Boubelik,* 553 N.W.2d at 395 (noting plaintiffs under the CFA obtained bank loan for the purpose of investing in a bar and restaurant).[11] While the CFA does not define "consumer," the legislative history clearly indicates that the CFA was intended to protect a broad, though not limitless, range of individuals from fraudulent and deceptive trade practices, and our decisions have also recognized the breadth of its coverage. *See* Gary L. Wilson & Jason A. Gillmer, *Minnesota's Tobacco Case: Recovering Damages Without Individual Proof of Reliance Under Minnesota's Consumer Protection Statutes,* 25 Wm. Mitchell L.Rev. 567, 576 (1999) ("Minnesota's consumer protection statutes were enacted to protect Minnesota consumers from unlawful and fraudulent business practices * * * and are broadly construed to protect the consuming public."). Thus, viewing appellant as a "consumer" under the CFA does not push application of the statute onto new ground.

■ We are also on established ground in holding that even though the unlawful practices respondent engaged in here were in the context of an isolated one-on-one transaction, coverage under the CFA may still be afforded. In *Church of Nativity* we held that the transaction fell under the CFA where an individual purchaser was involved in a single transaction without regard to whether the fraudulent representations were disseminated to other consumers. 491 N.W.2d at 8 (plaintiff was a parish contracting to reroof school and convent).[12] We attach no importance to the statutory reference to the term "others" in "with the intent that *others* rely thereon," as it most reasonably can only mean that the fraudulent conduct must not have been committed in a vacuum–it must have been intended to deceive someone. *See* Minn.Stat. § 645.08(2) (1998) ("[t]he singular includes the plural; and the plural, the singular"). We conclude that the unlawful practices here, occurring while engaging in a one-on-one transaction for the purchase of a business for operation and not resale, fall within the trade practices prohibited by section 325F.69, subdivision 1.

## II. The Private Attorney General Statute

The attorney general is provided broad statutory authority under Minn.Stat. § 8.31 to investigate violations of law regarding unlawful business practices barred by a variety of statutory prohibitions including the Consumer Fraud Act, and to seek injunctive relief and civil penalties on behalf of the state. *See* Minn.Stat. § 8.31, subds. 1, 3 (1998). The Private AG Statute, section 8.31, subdivision 3a, further provides that "any person injured by a violation" of the laws entrusted to the attorney general to investigate and enforce may recover damages together with costs and attorney fees: "In addition to the remedies otherwise provided by law, any person injured by a violation of * * * [Minn.Stat. § 325F.69] may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees * * *." Minn.Stat. § 8.31, subd. 3a.

---

11. We held that the transaction was not covered by the CFA because loans were not included in the CFA at that time. *See Boubelik,* 553 N.W.2d at 403. However, neither party disputed that the plaintiffs, as applicants for a loan to be invested in a business, could bring suit under the CFA.

12. The court of appeals held similarly in *Yost v. Millhouse.* 373 N.W.2d 826, 831–32 (Minn.App.1985) (holding individual purchasing two horses was covered by the CFA).

The sweeping remedies of the Private AG Statute have raised concern about how broadly the legislature intended the statute to be applied, particularly as it relates to common law fraud actions and the recovery of attorney fees. *See, e.g., Church of Nativity*, 491 N.W.2d at 10 (Simonett, J., concurring in part and dissenting in part) (expressing concern that a consumer can claim attorney fees for "almost any commercial transaction that fails"). A brief history of the passage of the Private AG Statute sheds light on this issue and reveals the statutory purpose in providing incentives to injured private parties to enforce the unlawful business practices statutes as a substitute for the attorney general. On March 8, 1973, Senator Winston Borden, author of the bill, in a hearing before the Labor and Commerce Committee, stated that its goal was to:

> allow the individual person to bring a civil action for the damages he sustained * * * it's a great means of private enforcement. It's simply impossible for the Attorney General's Office to investigate and prosecute every act of consumer fraud in this state. * * * [And] if a[n] individual could bring an action, he can do some of the prosecuting, he can do some of the enforcing, he can provide some of the protection for himself and others that the Attorney General's Office * * * can not do today * * *.[13]

Similarly, on March 30, 1973, Representative Sieben stated that the purpose of the Private AG Statute is to stop the "unscrupulous * * * businessman who makes * * * false and deceptive ads," and with its adoption "a private citizen may take the person to court * * * when the citizen has been defrauded and he may recover damages plus reasonable attorney's fees or injunctive relief."[14] Representative Sieben also referred to the importance of providing an incentive to consumers to privately enforce the fraudulent business practices laws: "an operator who can * * * rip off a large number of citizens, and cease operating * * * may likely be able to do so with little threat of legal action. More stringent remedies are therefore needed. * * * [This bill] provides a route for private recovery for the victims of consumer fraud."[15]

The Private AG Statute thus advances the legislature's intent to prevent fraudulent representations and deceptive practices with regard to consumer products by offering an incentive for defrauded consumers to bring claims in lieu of the attorney general. In *Church of Nativity* we acknowledged the legislative intent to "eliminate financial barriers to the vindication of a plaintiff's rights * * * and to provide incentive for counsel to act as private attorney general." 491 N.W.2d at 8 (quoting *Liess v. Lindemyer*, 354 N.W.2d 556, 558 (Minn.App.1984)). We commented:

> Nativity's pursuit of a remedy has involved much time and labor; it has been difficult, lengthy and expensive. If there are no attorney fees awarded in this case, Nativity will spend virtually all of its damage award paying its attorneys. The private attorney general statute was intended to cover just this type of case.

*Id.* at 8 (footnote omitted). Thus we held that the parish was entitled to the benefits of the Private AG Statute. *See id.*[16]

---

13. Hearing on S.F. 819, S. Comm. Labor and Commerce, 68th Minn. Leg., Mar. 8, 1973 (audio tape) (comments of Sen. Borden, Senate sponsor of the bill).

14. Hearing on H.F. 733, H. Comm. Commerce and Econ. Dev., 68th Minn. Leg., Mar. 30, 1973 (audio tape) (comments of Rep. Sieben).

15. *Id.*

16. The dissent in *Church of Nativity* agreed with the majority that the cause of action fell under the CFA but noted that the distributor and supplier of the faulty roofing material used to reroof the parish and school also requested attorney fees and the trial court denied their request, reasoning that they were "not the types of consumers the statute was designed to protect." 491 N.W.2d at 10–11

The court of appeals has expressed reservations about broadening the scope of section 8.31 similar to those of Justice Simonett's dissent in *Church of Nativity* and has required a showing of public benefit to award attorney fees under the Private AG Statute. For example, in *Liess,* the court held that in considering a claim for an award of attorney fees under section 8.31, ordinarily a district court must take into account the nature, extent and outcome of the attorney's work [17] and in addition, it "must take into account the degree to which the public interest is advanced by the suit, * * * otherwise, 'every artful counsel could dress up his dog bite case' to come under an attorney's fees statute."

354 N.W.2d at 558 (quoting *Boland v. City of Rapid City,* 315 N.W.2d 496, 503 (S.D. 1982)) (citations omitted). Similarly, in *Wexler v. Brothers Entertainment Group,* the court held that "[w]hen awarding attorney fees under the private attorney general statute, the trial court must consider the public interest policies underlying the statute." 457 N.W.2d 218, 222–23 (Minn.App.1990); *see also Untiedt v. Grand Lab., Inc.,* Nos. C4–94–772, C0–94–851, 1994 WL 714308, at *3 (Minn.App. Dec. 27, 1994) (citing the rule in *Liess* and holding that because the trial court found that the cause of action would advance the public interest, the trial court considered the appropriate factors).[18]

(Simonett, J., concurring in part and dissenting in part).

The dissent disagreed with the majority's award of attorney fees to plaintiffs under the Private AG Statute, noting that the Private AG Statute is directed not at isolated fraud but "at deceptive practices to which the consumer public is prey," and expressing concern that "enterprising plaintiffs, understandably interested in recovering investigation costs and attorney fees, may expand the [Private AG Statute] beyond its intended scope." *Id.* at 10 (Simonett, J., concurring in part and dissenting in part) (citing *Liess,* 354 N.W.2d at 558). Concluding that "an attorney fee award is not intended for so-called 'private' disputes," the dissent suggested a four-part test for awarding attorney fees:

(1) the plaintiff must be a consumer, who is

(2) injured by an actionable fraud (such as in a common law action for a false pretense, a false promise or a misrepresentation), and

(3) the fraud must have the potential to deceive and ensnare members of the consumer public other than just the plaintiff, so that

(4) plaintiff's lawsuit has been of benefit to the public.

*Id.* at 10–11.

**17.** The court held that the factors set forth in *State v. Paulson,* 290 Minn. 371, 373, 188 N.W.2d 424, 426 (1971), were appropriate considerations, specifically: "all relevant circumstances, including the time and labor required, the nature and difficulty of the responsibility assumed; the amount involved and the results obtained; the fees customarily charged for similar legal services; the experience, reputation, and ability of counsel; and the fee arrangement existing between counsel

and the client." *Id.; Liess,* 354 N.W.2d at 558.

**18.** Some federal courts also emphasize the degree the public interest is advanced by the suit. In *Martin v. Hancock,* the court held that "the 'private attorney general' concept * * * is based on the rationale that counsel fees should be awarded by the court when the legal services have provided a benefit to a class of persons, not just the particular litigant." 466 F.Supp. 454, 456 (D.Minn.1979). Similarly, in *Cooperman v. R.G. Barry Corp.,* the court held that where the fraud related to an employment relationship with defendant, "[s]uch a broad reading of the [Act] would render it applicable to any contract remotely related to the ultimate sale of merchandise. It is unlikely that the Legislature intended the [Act] to have such broad application." 775 F.Supp. 1211, 1214 (D.Minn.1991).

Other state courts have similarly held that a public purpose must be demonstrated. In *Lightfoot v. MacDonald,* the Washington Supreme Court held that its Consumer Protection Act, modeled after the Federal Trade Commission Act, provides no remedy for private wrongs because "the community's interest in seeing that private rights are respected is not a sufficient public interest." 86 Wash.2d 331, 544 P.2d 88, 90, 92–93 (1976). An Illinois court of appeals held that the Consumer Fraud Act of Illinois did not apply in basic breach of contract cases and stated the relevant issue to be "whether the alleged conduct * * * implicates consumer protection concerns." *Brody v. Finch Univ. of Health Sciences,* 298 Ill.App.3d 146, 232 Ill.Dec. 419, 698 N.E.2d 257, 268–69 (1998) (quoting *Lake County Grading Co. v. Advance Mechanical Contractors, Inc.,* 275 Ill.App.3d 452, 211 Ill. Dec. 299, 654 N.E.2d 1109, 1115 (1995)).

Appellant argues that the aim of the Private AG Statute is to encourage victims of fraud to bring claims and nowhere does it provide that attorney fees are contingent upon demonstrating that a cause of action creates a public benefit. Respondent contends that the Private AG Statute should not cover fraud arising from private disputes but only those where the fraud has the potential to deceive more than the single claimant and the lawsuit benefits the public. Respondent emphasizes that the purpose of the Private AG Statute is to protect public, not private, interests and that attorney fees should be awarded only if the record reflects proper consideration of the policies underlying the statute.

A determination of the scope of the private remedies provision in the Private AG Statute must begin with the recognition that it was adopted by the legislature in 1973 [19] as part of the statutory charter for the duties and responsibilities of the attorney general and provides a reward to private parties for uncovering and bringing to a halt unfair, deceptive and fraudulent business practices, functions that, to that point, had been the responsibility of the attorney general. Since the Private AG Statute grants private citizens the right to act as a "private" attorney general, the role and duties of the attorney general with respect to enforcing the fraudulent business practices laws must define the limits of the private claimant under the statute. Minnesota Statutes § 8.01 (1998) provides that the attorney general shall appear for the state in civil lawsuits "whenever, in the attorney general's opinion, the interests of the state require it." Minn.Stat. § 8.01.[20] In *Slezak v. Ousdigian*, we held that the attorney general:

> may institute, conduct, and maintain all such actions and proceedings as he deems necessary for the enforcement of the laws of the state, the preservation of order, and the protection of public rights. * * * He has the authority to institute in a district court a civil suit in the name of the state whenever the interests of the state so require.

260 Minn. 303, 308, 110 N.W.2d 1, 5 (1961) (citation omitted). The duty of the attorney general's office, and thus the purpose of any statute granting private citizens authority to bring a lawsuit in lieu of the attorney general, is the protection of public rights and the preservation of the interests of the state.

The interest of the legislature in creating a supplemental force of private enforcement to address unlawful trade practices is clear from the testimony at committee hearings,[21] but it is equally clear that the sweep of the statute can be no broader than the source of its authority— that of the attorney general–whose duties are to protect *public* rights in the interest of the state. Conversely, it is not the responsibility of the attorney general to protect private or individual interests independent of a public purpose. *See, e.g., Humphrey v. McLaren*, 402 N.W.2d 535, 543 (Minn.1987) (stating that the attorney general "has for a client the public, * * * [t]hus, a government litigator must take positions with the common public good in mind, unlike the private practitioner who

---

**19.** See Act of May 3, 1973, ch. 155, § 4, 1973 Minn. Laws 294, 297.

**20.** The relevant portion of the statute provides:

> The attorney general shall appear for the state in all causes in the supreme and federal courts wherein the state is directly interested; also in all civil causes of like nature in all other courts of the state whenever, in the attorney general's opinion, the interests of the state require it. Minn.Stat. § 8.01.

**21.** See, for example, Representative Sieben's comment that the Private AG Statute is intended to stop those who "rip off a large number of citizens." Hearing on H.F. 773, H. Comm. Commerce and Econ. Dev., 68th Minn. Leg., Mar. 30, 1973 (audio tape) (comments of Rep. Sieben).

seeks vindication of a particular result for a particular client").[22]

We find further support for our holding that public interest must be demonstrated to state a claim under the Private AG Statute based on our conclusion that the legislature could not have intended to sweep every private dispute based on fraud, and falling within the CFA, into a statute where attorney fees and additional costs and expenses would be awarded, because to do so would substantially alter a fundamental principle of law deeply ingrained in our common law jurisprudence–that each party bears his own attorney fees in the absence of a statutory or contractual exception. *See Church of Nativity*, 491 N.W.2d at 10 (Simonett, J., concurring in part and dissenting in part); *see also Barr/Nelson, Inc. v. Tonto's, Inc.*, 336 N.W.2d 46, 53 (Minn. 1983) ("We have long held that attorney fees are not recoverable in litigation unless there is a specific contract permitting or a statute authorizing such recovery."). We have for as long presumed that statutes are consistent with the common law, and if a statute abrogates the common law, the abrogation must be by express wording or necessary implication. *See In re Shetsky*, 239 Minn. 463, 469, 60 N.W.2d 40, 45 (1953). We decline to construe legislative intent to abrogate the common law with regard to the attorney fees provision in the absence of a clear purpose to do so.

Based on these considerations we hold that the Private AG Statute applies only to those claimants who demonstrate that their cause of action benefits the public.[23] We believe that this conclusion is consistent with the history and purpose of the office of the attorney general to prosecute misrepresentations involving only matters of public interest.[24] Appellant was defrauded in a single one-on-one transaction in which the fraudulent misrepresentation, while evincing reprehensible conduct, was made only to appellant. A successful prosecution of his fraud claim does not advance state interests and enforcement has no public benefit, and is not a claim that could be considered to be within the duties and responsibilities of the attorney general to investigate and enjoin.[25]

Affirmed in part and reversed in part.[26]

22. The dissent makes the point that if the legislature intended to require a showing of public benefit under the Private AG Statute then it would have said so, but our analysis is based on the statutory authority of the attorney general. If the attorney general is not authorized to commence a proceeding because. it would not result in a public benefit, *see McLaren*, 402 N.W.2d at 543, then a claimant under the Private AG Statute is similarly constrained.

23. This policy has been reflected in court of appeals decisions where the court has used a public benefit analysis to determine whether to award attorney fees under the Private AG Statute, *see, e.g., Untiedt*, 1994 WL 714308, at *3; *Wexler*, 457 N.W.2d at 222–23; *Liess*, 354 N.W.2d at 558, and the dissent in *Church of Nativity* in some sense validated the lower courts' method of awarding attorney fees, 491 N.W.2d at 10–11 (Simonett, J., concurring in part and dissenting in part).

24. Further, the award of investigative costs acknowledges this public interest, as fruits of a successful investigation in a matter of public interest, would be available to others and the attorney general; investigation of a private dispute however, even if successful in uncovering a fraudulent business practice, would be of benefit only to the private party defrauded.

25. In *Church of Nativity* we affirmed the award of attorney fees holding that the Private AG Statute was "intended to cover just this type of case." 491 N.W.2d at 8. We did not engage in analysis as to public benefit and no evidence was adduced as to whether the church's claim provided a public benefit. To the extent that *Church of Nativity* could be construed to permit recovery under the Private AG Statute without proof of public benefit, it is overruled.

26. Appellant also requests prejudgment interest in the amount of $1,265.40. We generally do not consider matters not argued and considered by the court below. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988). The trial court did not address this issue and the court of appeals specifically declined to consider it because the trial court did not.

PAGE, Justice (concurring in part, dissenting in part).

I respectfully dissent. I agree with that portion of the court's opinion holding that the Consumer Fraud Act applies to a cause of action brought by a plaintiff who was defrauded in an isolated one-on-one purchase of a restaurant for the purpose of selling restaurant services. I disagree, however, with that part of the opinion holding that Minn.Stat. § 8.31, subd. 3a (1998), does not permit an award of attorney fees in cases arising under the Consumer Fraud Act unless the plaintiff can demonstrate that the cause of action has a public benefit. "[When] the words of a statute are clear and free from ambiguity, we have no right to construe or interpret the statute's language." *Tuma v. Commissioner of Econ. Sec.*, 386 N.W.2d 702, 706 (Minn.1986). "Our duty in such a case is to give effect to the statute's plain meaning." *Id.* The words the legislature used in Minn.Stat. § 8.31, subd. 3a are clear and free from ambiguity. Subdivision 3a, in relevant part, reads:

> In addition to the remedies otherwise provided by law, *any person injured by a violation* of any of the laws referred to in subdivision 1 may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court.

Minn.Stat. § 8.31, subd. 3a (emphasis added).

Had the legislature intended to limit the scope of section 8.31, subdivision 3a, to those causes of action that have a public benefit, it could have easily done so. Whether for good or for ill, by the plain words of the statute, it did not. This court is not authorized nor is it this court's role to read into a statute that which the legislature, by its plain language, has left out.

We also deny appellant's request to consider

GILBERT, Justice (dissenting).

I join in the concurrence and dissent of Justice Page.

GILBERT, Justice (concurring in part, dissenting in part).

I concur with the majority's holding that Minn.Stat. § 325F.69, subd. 1 (1998) (CFA) applies to an individual consumer involved in a one-on-one transaction. However, I respectfully dissent from the majority's conclusion that Minn.Stat. § 8.31, subd. 3a (1998), the private attorney general statute, is not applicable to this transaction. I agree with Justice Page's dissent in its entirety, including the point that the majority artificially engrafts a "public benefit" requirement onto an unambiguous statute. I write separately, however, to emphasize my disagreement with the majority's holding that bringing an action to prosecute conduct, which we hold falls under the prohibitions of the CFA, would not serve the public interest. Further, I conclude that the majority's holding is an unreasonable result in that section 8.31, subdivision 3a, explicitly incorporates section 325F.69 within its purview. We have no legal authority to read out of a statute that which the legislature has explicitly included.

Even if the majority is correct in finding some implicit requirement of public benefit in the private attorney general statute, I disagree with the majority's resolution of the fact question at the appellate level. As the majority notes, respondent sold this same restaurant to another purchaser later the same day after respondent fraudulently induced appellant to nullify the contract of sale. It is quite possible that enforcing the fraudulent business laws against this particular respondent will have a benefit to more than appellant-purchaser. This fact question should be remanded to the district court. I, would, however, interpret this newly discovered "public benefit" requirement to include this issue.

private enforcement of the consumer protection laws.

The majority holds that although the CFA is intended to protect even the consumer defrauded in an "isolated one-on-one transaction," and even if that same consumer successfully brings suit under the CFA for that unlawful conduct, he is not entitled to reasonable attorney fees under section 8.31, subdivision 3a, because such a transaction does not enhance the public interest generally. That holding is contrary to the purpose of section 8.31, subdivision 3a, which, as the majority acknowledges, was intended to provide incentives for injured consumers to privately enforce the fraudulent business practices laws by eliminating financial barriers to prosecution. *See Church of Nativity of Our Lord v. WatPro, Inc.*, 491 N.W.2d 1, 8 (Minn.1992). When "any person" is injured by a violation of those laws and successfully prosecutes the violator, that consumer has benefited the public by attempting to prevent the fraudulent business conduct of that particular defendant and alleviating, economically and in terms of time and preparation for investigation and litigation, the burden on the attorney general's office to enforce the laws. As we said in *Church of Nativity*, a case involving an individual purchaser involved in a single transaction, "pursuit of a remedy has involved much time and labor; it has been difficult, lengthy and expensive. If there are no attorney fees awarded in this case, [the consumer] will spend virtually all of its damage award paying its attorneys. The private attorney general statute was intended to cover just this type of case." 491 N.W.2d at 8. It creates an unreasonable result to hold that enforcement of the state's laws does not benefit the public generally.

We hold that appellant is a person injured by a violation of section 325F.69, subdivision 1. Therefore, the clear, unambiguous language of section 8.31, subdivision 3a, dictates that he is entitled to attorney fees. Accordingly, I would reverse the court of appeals and remand to the district court for a determination of appropriate attorney fees and investigative costs.